Filed 6/1/26  P. v. Francisco CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DON ADRIAN FRANCISCO,<br><br>    Defendant and Appellant. | H052941<br>(Santa Clara County<br>Super. Ct. No. C1902544) |

Defendant Don Adrian Francisco was convicted by jury of various sexual offenses against minor Jane Doe.[1]  (Pen. Code, §§ 288, subds. (a) & (c)(1), 289, subd. (j).)  He contends on appeal that the trial court abused its discretion by allowing expert testimony beyond the proper scope of Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence.  He also argues that Doe's testimony regarding Facebook messages was improper hearsay evidence.  Finding no reversible error, we will affirm the judgment.

## I.    TRIAL COURT PROCEEDINGS

Defendant was charged with ten counts of lewd acts on a child under the age of 14 (Pen. Code, § 288, subd. (a); counts 1–5, 11–15); eight counts of oral copulation involving a child under the age of 14 and more than 10 years his junior (Pen. Code, § 288, subd. (c)(1); counts 6–10, 16–18); and two counts of sexual penetration of a child under the age of 14 and more than 10 years his junior (Pen. Code, § 289, subd. (j)).  Jane Doe was the alleged victim of all twenty charged offenses.

---

[1]  Although referred to by initials in the briefs, we use the moniker Jane Doe in the interest of privacy for Doe and her family members.  (Cal. Rules of Court, rule 8.90.)

## A. WITNESS TESTIMONY

Doe was 24 years old at the time of trial. She testified that defendant repeatedly abused her sexually in 2012 and 2013 when she was 12 and 13 years old. Doe lived or spent summers in the same house as defendant from the time she was 5 to 13 years old. Defendant is the brother of the then-boyfriend of Doe's mother, and Doe referred to defendant as her uncle. Defendant often took Doe to the mall with her brothers and watched movies with her in his bedroom.

When Doe was around 12 years old, defendant began to more often take Doe to the mall by herself. He bought her a luxury handbag. Defendant told Doe that he felt her mom and his brother were neglecting her and that he loved her. According to Doe and Doe's mother, Doe spent a lot of time in defendant's room. She slept on a couch there, while defendant and his girlfriend slept on an adjacent bed.

Doe's mother testified she confronted defendant when Doe was 12 years old after defendant's friend described seeing defendant with his arms wrapped around Doe at the mall, and defendant denied the accusation. She then instated a policy that the door to defendant's room had to remain open, which was enforced by defendant's girlfriend. But the door was often closed when Doe was in defendant's room. Doe's mother told Doe around the time she was 12 years old to tell her if someone touched her inappropriately.

The court allowed Doe to testify about Facebook messages she exchanged with two individuals for the non-hearsay purpose of their effect on Doe. Doe created a Facebook account when she was 12 years old. She accepted a friend request from someone named "Cam" who claimed to know Doe from school. Cam introduced Doe via Facebook to "Rose", who stated she knew defendant. Rose would discuss sex with Doe in their Facebook exchanges. Rose told Doe that she had sex with her cousin when she was 12 and her cousin was 20 years old. Rose asked Doe if she found defendant attractive and how she would feel about having sex with him. Doe's mother testified that she monitored Doe's phone but had not seen anything inappropriate.

During the summer when Doe was 12 years old, Rose asked Doe how she would feel if defendant touched her. Doe was sitting on the couch in defendant's room at the time, and defendant was sitting at a desk next to the couch with Facebook open on his computer. After Rose posed the question, defendant immediately turned around and touched Doe's breasts with his hands and mouth. Doe did not inform anyone because her brothers were related to defendant and she was afraid she would cause her mother to fight with her boyfriend, defendant's brother.

After that incident, defendant told Doe that she should lose her virginity to him because he cared about her; he referred to himself as an uncle, a friend, and a boyfriend. Doe remembered "starting to think that it might be okay" to lose her virginity to him. Doe also continued to exchange messages about sex with Rose. About a month after the first incident, Rose asked Doe how she would feel about losing her virginity to defendant. Once again, defendant immediately turned from his computer at the desk toward the couch where Doe was sitting in defendant's bedroom. This time he touched Doe's breasts, pulled down Doe's pants, and put his penis in her vagina. Defendant then put his penis in Doe's mouth and ejaculated. Defendant's girlfriend was asleep on the bed nearby during the incident, but Doe's view of the girlfriend was blocked by furniture.

That summer, defendant had sex with Doe on an almost daily basis and often placed his penis in her mouth. Defendant continued to have sex with Doe during the school year and after Doe turned 13 years old the following summer. He also continued to place his penis in Doe's mouth and sometimes inserted fingers into her vagina. Defendant showed Doe pornography, had Doe send him nude photos and videos of herself masturbating, and bought her a vibrator.

Doe stopped the sexual activity with defendant around the time she began dating her first boyfriend during the beginning of ninth grade. She decided she did not like spending time with her mother's boyfriend or his family. After defendant threatened to

3

show Doe's family and friends the nude photos and videos, Doe stopped talking to defendant on a regular basis and told Rose how she felt about defendant threatening her.

Doe told her boyfriend about the sexual abuse a couple of years into their relationship. She reported the abuse to her mother and father in 2019 and went to the police.

As part of the police investigation, Doe initiated a pretext call with defendant. According to the investigating detective, defendant did not make any admissions or denials during the call. Doe's Facebook exchanges with Rose were never recovered.

Defendant's eldest brother lived in the same house as defendant and testified that he never saw defendant touch Doe and never got "a weird vibe" about the relationship between defendant and Doe. He did inform Doe when she was 13 or 14 years old that he had been convicted of sexual assault against a minor and that the conviction negatively impacted his life and finances. Defendant's girlfriend testified that she never heard anything consistent with sexual activity while she slept on the bed in defendant's room and never saw anything inappropriate between defendant and Doe.

## B. EXPERT TESTIMONY

Over defendant's objection to the presentation of rebuttal evidence in the prosecution's case in chief, the court permitted Dr. Blake Carmichael to testify as an expert in Child Sexual Abuse Accommodation Syndrome (CSAAS). He offered general testimony on recognized myths and misconceptions about child sexual abuse. Dr. Carmichael is a clinical psychologist who has been licensed for 21 years. He confirmed he did not know the witnesses, the defendant, or any information about the case.

Dr. Carmichael testified that CSAAS is an education tool in trauma-focused cognitive behavioral therapy that helps explain why a child may not inform anyone or act as expected while being abused. It is not a diagnostic tool or a scientific instrument, nor are the behaviors described a checklist to determine if a child has been abused.

Dr. Carmichael testified that the researcher who first wrote about CSAAS released a second article a decade later criticizing attorneys' use of CSAAS to say that a child was or was not abused. Whether a particular child was abused is solely for the factfinder to decide in any given case.

Dr. Carmichael described five elements of CSAAS: secrecy; helplessness; entrapment and accommodation; delayed, unconvincing, and conflicted disclosure; and recanting or retraction. When discussing the secrecy myth of CSAAS, Dr. Carmichael testified that a child's reaction to inappropriate sexual touch must be understood in the context of their relationship with the perpetrator. Due to the relationship with the perpetrator, a child may not inform an adult about the abuse even when instructed to tell. Dr. Carmichael described grooming as relationship development relevant to secrecy.

Dr. Carmichael explained that the aspect of helplessness derives from the power dynamic between the child and the perpetrator. The child may feel they cannot tell anyone about the abuse due to the size, intellect, and influence of the perpetrator and because of the risks involved with disclosure. The child may think they would not be believed or would get in trouble by telling others. The child may also believe that the person they tell would be in trouble or that informing someone would destroy the family.

Dr. Carmichael also explained misconceptions involving entrapment and accommodation; delayed, unconvincing, and conflicted disclosure; and recanting or retraction. He stated a child may act differently in subtle ways or dissociate to distance themselves from the abuse or blame themselves for not doing enough to stop the abuse while continuing to enjoy spending time with the perpetrator. Most children do not quickly tell someone about sexual abuse and may instead share details slowly over time. A child may share contradictory or vague statements as they attempt to explain abstract concepts, or may retract their statements about abuse because they want things to return to the way they were.

5

For the defense, Dr. Hy Malinek testified as a licensed clinical psychologist and an expert in the area of clinical and forensic psychology. Dr. Malinek completed an evaluation of defendant and opined defendant did not suffer from pedophilic disorder.

## C. VERDICT AND SENTENCING

Defendant was found guilty of all charges. The court imposed an aggregate sentence of 22 years, and awarded 221 days of presentence custody credit.

## II. DISCUSSION

## A. CSAAS EVIDENCE WAS PROPERLY LIMITED IN SCOPE AND CONTENT

CSAAS reflects a body of clinical research identifying common behaviors displayed by children known to have been sexually abused. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 392, fn. 8 (*Bowker*).) CSAAS evidence is admissible in California for the limited purpose of dispelling five common misconceptions about child sexual abuse to aid in evaluating the credibility of a child's allegations of abuse. (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*).) Such evidence is relevant when an alleged victim displays paradoxical behavior, such as delayed or conflicting reporting. (*People v. Flores* (2024) 101 Cal.App.5th 438, 455–456 (*Flores*); *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745 (*Patino*).) CSAAS evidence is not admissible to prove that a child was molested. (*Patino*, at p. 1744.) CSAAS testimony must be targeted to a particular or misconception suggested by the evidence, and the jury must be instructed that the CSAAS testimony is not intended to determine whether the allegations are true. (*Bowker*, pp. 393–394.) As with other evidentiary rulings, we review the treatment of CSAAS evidence for abuse of discretion. We see no abuse of discretion in allowing expert testimony on CSAAS under the circumstances presented here. Doe did not report her abuse until years after it occurred. (*Flores*, at pp. 455–456; *Patino*, at pp. 1744–1745.) Defense counsel asked Doe why she did not report the alleged abuse earlier, why she did not summon help from defendant's girlfriend who was sleeping inches away the first time defendant placed his penis inside Doe, and why she did not inform the detective

6

about each and every alleged assault. Defense counsel urged in both his opening statement and closing argument that those "inconsistencies" harmed Doe's credibility. (*Patino*, at p. 1745.)

Dr. Carmichael testified generally about common myths in child sexual abuse reporting, including delayed disclosure issues raised by defense counsel. (*Bowker*, *supra*, 203 Cal.App.3d at pp. 393–394; *People v. Wells* (2004) 118 Cal.App.4th 179, 190.) He emphasized that he does not know the witnesses and was not familiar with the facts of the case. He also confirmed that CSAAS is not a diagnostic tool to determine whether abuse has occurred. Immediately on recognizing Dr. Carmichael as a CSAAS expert, the trial court admonished the jury using CALCRIM 1193 that his testimony is not evidence that defendant committed any of the crimes charged and is offered only to explain the behavior of an alleged child sexual abuse victim so the jury could consider whether Doe's conduct was consistent with the conduct of someone who had been molested to evaluate her believability. (*Bowker*, at pp. 393–394; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504 (*Gonzales*) [discussing CALCRIM No. 1193].) Throughout Dr. Carmichael's testimony, the court reminded the jury that it was general testimony and not specific to the case. The court again instructed the jury after the close of evidence that Dr. Carmichael's testimony was not evidence that defendant committed a crime and was only to be used in evaluating Doe's believability to decide whether her conduct was consistent with being a child sexual abuse victim.

Consistent with the trial court's instructions, we acknowledge that the proper focus of CSAAS evidence is on the behavior of child victims, not perpetrators of child sexual abuse. Although Dr. Carmichael provided information on perpetrators in discussing the five myths associated with a child's reaction to sexual abuse, we do not find the testimony to constitute profile evidence as defendant asserts. Dr. Carmichael explained that "[w]e have to understand the child's reaction to [the] inappropriate sexual touch in the context of the relationship they have with their perpetrator," and that perpetrators are

7

often a known, trusted, even loving person in the child's life that the child looks up to. Such a perpetrator can include a family member, community leader, a coach, or some legitimate person in the child's life that people expect to be in contact with the child. The perpetrator may make coercive and aggressive threats to prevent disclosure, or a child may be unwilling to report abuse because they may be receiving special attention or privileges. Dr. Carmichael stated that children sometimes accommodate abuse because they cannot avoid their abuser, such as in the home, in a carpool, or at soccer practice. Dr. Carmichael also provided an example of conflicted disclosure, describing a mother dismissing a child's concerns about an "Uncle Joey" causing the child to share details over time rather than all at once.

CSAAS evidence is admissible only for the limited purpose of evaluating a child abuse victim's credibility. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 171; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301.) Experts are permitted to provide general information acquired through training and experience, as long as the testimony is relevant to the case yet does not include case-specific facts not otherwise in evidence. (*People v. Sanchez* (2016) 63 Cal.4th 665, 676 (*Sanchez*).) Nor may the expert vouch for the truthfulness of the victim's allegations. (*People v. Sedano* (2023) 88 Cal.App.5th 474, 479–480 (*Sedano*).) Expert testimony that would invite the jury to apply the syndrome to conclude a particular child victim was in fact sexually abused is impermissible. (*People v. Julian* (2019) 34 Cal.App.5th 878, 885–886 (*Julian*).) Trial courts, counsel, and expert witnesses must be vigilant in this regard, to avoid interfering with the jury performing its proper function of weighing the evidence on the issue of guilt. (*Ibid.*) But the permissible scope of CSAAS evidence is not as limited as defendant contends. Although CSAAS evidence is properly used to dispel myths about the behavior of child victims (rather than child abusers), a CSAAS expert might not be able to fully explain the possible reasons for a child's delayed or inconsistent reporting without some ability to discuss how abusers "think, act, and manipulate children." We do not construe the broad

8

categories Dr. Carmichael discussed as a profile that would lead a jury to convict defendant just because he may fall within one or more of those categories. And his mention of a hypothetical "Uncle Joey" in the context he described in no way suggested defendant likely abused Doe merely because she thought of him as an "uncle." (*Sedano*, at pp. 482–483.)

Defendant argues Dr. Carmichael was permitted to testify beyond the scope of CSAAS evidence by providing statistical and anecdotal evidence. Dr. Carmichael testified that "we don't often see kids biting, kicking, screaming, and somehow warding off their perpetrator" and that "we don't see a lot of" kids protesting and crying out during molestation or informing adults about abuse right away. He also stated it was "common" for a child to freeze. We do not equate the references to "a lot," "often," and "common" with improper statistical CSAAS evidence. An expert merely stating from relevant training and experience that sexually abused children frequently exhibit certain characteristics is not inappropriate. (*Bowker*, *supra*, 203 Cal.App.3d at p. 393.)

Even viewing the words "often" and "a lot" as suggesting statistical probabilities, we see no prejudice on this record. We will not reverse the judgment unless it is reasonably probable that a result more favorable to defendant would have been achieved had the evidence been excluded. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 170 [error reviewed for prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)].) The testimony itself as well as the court's instructions made clear to the jury that Dr. Carmichael was describing common behaviors of known child abuse victims, not opining on the truth or likelihood of any alleged abuse, which we agree would be outside the scope of permissible CSAAS evidence. (*Sedano*, *supra*, 88 Cal.App.5th at pp. 481–482; cf. *People v. Wilson* (2019) 33 Cal.App.5th 559, 568, 570 [CSAAS expert " 'step[ped] outside' " of CSAAS to discuss studies quantifying percentage of false allegations, suggesting a likelihood victims' testimony was truthful and invading the jury's responsibility to draw ultimate evidentiary inferences]; *Julian*, *supra*, 34 Cal.App.5th at

9

pp. 883–884, 886 [testimony regarding percentage of false allegations invited the jury to presume guilt based on statistical probabilities]; *Lapenias*, at pp. 176–177 [testimony that it was rare for children to make false claims of sexual abuse erroneously admitted as opining on a witness's credibility].)  Dr. Carmichael was neither asked for nor did he offer an opinion on the veracity of Doe's disclosures.  He repeated to the jury that CSAAS is not a diagnostic tool, but merely rebuts myths associated with delayed or inconsistent disclosure by child abuse victims.  He emphasized that the decision about whether a particular child was abused is within the purview of the jury.  And the trial court properly instructed the jury on the limited purpose of Dr. Carmichael's testimony.  (*Bowker*, *supra*, 203 Cal.App.3d at pp. 393–394; *Gonzales*, *supra*, 16 Cal.App.5th at pp. 503–504.)

The prosecution's case in chief was extensive.  Doe testified as an adult in great detail about defendant repeatedly sexually abusing her when she was 12 and 13 years old.  She stated that defendant told her she should lose her virginity to him because he cared about her, and he referred to himself as a boyfriend.  He asked her to send him nude photos and videos.  Other evidence supported Doe's account.  The investigating detective testified that during a pretext call, defendant did not explicitly deny Doe's accusations of sexual abuse.  Doe's mother and defendant's girlfriend testified that Doe spent a lot of time with defendant behind closed doors and without adult supervision and that Doe eventually wanted to stop sleeping in the same room as defendant and visiting the house he lived in.  It is not reasonably probable that a result more favorable to defendant would have been reached had Dr. Carmichael not used phrases which defendant claims are susceptible of profiling or statistical association.  (*Lapenias*, *supra*, 67 Cal.App.5th at p. 171.)

### B. FACEBOOK MESSAGES WERE NOT HEARSAY

An out-of-court statement offered in a criminal case is assessed in two steps.  (*Sanchez*, *supra*, 63 Cal.4th at p. 680.)  First, the court determines if the statement is

10

inadmissible hearsay by considering whether the statement was made out of court, is offered to prove the truth of the facts it asserts, and does not fall under a hearsay exception. (*Ibid.*) Second, if the hearsay statement is offered by the prosecution and would pose a Confrontation Clause violation under *Crawford v. Washington* (2004) 541 U.S. 36, the court determines whether the statement is "testimonial" in character. (*Sanchez*, at p. 680; *People v. Armstrong* (2019) 6 Cal.5th 735, 790.) We review the first step deferentially for abuse of discretion. Although we review this latter step of the analysis independently (*People v. Lund* (2021) 64 Cal.App.5th 1119, 1132–1133), we note that defendant does not argue on appeal that the messages, although never recovered, are testimonial. (*People v. Veamatahau* (2018) 24 Cal.App.5th 68, 72, fn. 6.) We therefore limit our analysis to whether the messages are hearsay at all.

A statement is not hearsay if it is not used to prove the truth of the matter asserted, such as when the statement is used to explain its effect on a listener. (Evid. Code, § 1200; *People v. Ramirez* (2022) 13 Cal.5th 997, 1115.) Doe testified that Rose, a person she knew only through Facebook, said she had sex with her cousin when she was 12 years old and her cousin was 20. Doe also testified that Rose asked if she found defendant attractive and how she would feel about having sex with him. When Rose asked via Facebook how Doe would feel if defendant touched her, he immediately touched Doe's breasts with his hands and mouth. When Rose asked on another occasion how Doe would feel about losing her virginity to defendant, he immediately turned toward Doe, pulled down her pants, and put his penis in her vagina.

The prosecution offered testimony about the Facebook messages as circumstantial evidence that defendant posed as "Cam" and "Rose" in order to groom Doe for sexual abuse. Defendant argues there was insufficient foundation to suggest that defendant was posing as Rose or Cam, and further that they were offered for their truth because the jury would have "to look to and believe the sexual nature" of the messages to "rationally infer that [defendant] was behind these messages." But the record shows that the trial court

11

ultimately allowed the testimony only for the non-hearsay purpose of demonstrating the messages' impact on Doe.

During the relevant testimony, the trial court instructed the jury that the testimony regarding Rose was offered only to show "the impact on [Doe] and how it affected her belief who she was communicating to." None of the Facebook messages was offered to prove their content true. As a result, none of the statements attributed to Rose constitutes hearsay. (*Sanchez*, *supra*, 63 Cal.4th at p. 674.) Although defendant argues that in order to find defendant was sending the messages "their sexual nature required the jury to accept them as true," as we have explained we are not persuaded that the communications were hearsay in this context. But even if the trial court improperly allowed testimony about the messages, we see no reasonable probability of a result more favorable to defendant had the jury not heard the challenged testimony. (*People v. Valencia* (2021) 11 Cal.5th 818, 840 [improper admission of hearsay is statutory error to which *Watson* prejudice standard applies].) As we have noted, Doe's other testimony recounted the sexual abuse in detail, and other evidence (including defendant's reaction to Doe's accusations in a pretext call) supported her testimony. Defendant has therefore not shown prejudice, even if Doe's testimony concerning the Facebook messages were considered hearsay.[2]

### III. DISPOSITION

The judgment is affirmed.

---

[2] Defendant argues on appeal that the danger of unfair prejudice in admitting such testimony was unacceptably high under Evidence Code section 352 because the messages themselves were never found, preventing verification of their content. But because defendant did not object on that basis in the trial court, he has not preserved the issue for appeal. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 413.)

_____

Grover, Acting P. J.

**WE CONCUR:**

_____

Lie, J.

_____

Wilson, J.

H052941
*The People v Franciso*